**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **TIMOTHY GAGEN,** <br><br> Plaintiff, <br><br> v. <br><br> **CONTINENTAL CASUALTY COMPANY,** <br><br> Defendant. | Case NO. 05 C 1547 <br><br> Hon. Harry D. Leinenweber |

### MEMORANDUM OPINION AND ORDER

Defendant Continental Casualty Company (hereinafter, "CNA") moves for summary judgment on Plaintiff Timothy Gagen's (hereinafter, "Gagen") claims of discrimination under the Americans with Disabilities Act (the "ADA"), 29 U.S.C. 12101 *et seq.*, the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. 621 *et seq.*, and the Family and Medical Leave Act, 19 U.S.C. 2601 *et seq.* CNA also moves for summary judgment on its counterclaim for return of the severance payment made in connection with Gagen's termination. For the reasons discussed below, CNA's Motions for Summary Judgment are granted.

### I. BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions. Because this is a summary judgment motion, all reasonable inferences are settled in Gagen's favor.

### A. Employment at CNA

Gagen worked at CNA from May 1986 to July 2004 as a Risk Management Information Services ("RMIS") Consultant. Although Gagen worked on several clients, his primary client was The Kroger Co. In late 2003, Kroger stopped insuring with CNA. Gagen's duties included: providing risk management information and services to 24 national accounts' property and casualty businesses; fulfilling customers' requests for risk management; pricing and invoicing accounts; training customers in using CNA's RMIS system; and creating reports and exhibits for internal and external loss systems. Although Gagen received many positive reviews during his tenure at CNA, some of his reviews contained areas for improvement including wrongfully charging co-workers with improper behavior, using inappropriate language, his communication skills and generally working on relationships with his co-workers.

Sherry Demian ("Demian") became Gagen's supervisor in August 2003. She supervised a team of nine RMIS consultants, including Gagen. Demian reported to Nancy Gicewicz ("Gicewicz"). Since 2003, Gagen complained about several of his co-workers' behavior. Each complaint was investigated. In March 2004, Demian wrote a memorandum documenting concerns she had about Gagen and his behavior toward his team members.

**B. Hospitalization and Request for Time Off**

On April 18, 2004, Gagen was hospitalized for treatment of facial cellulites. He was discharged the next day. During his stay, Gagen was diagnosed with Type II Diabetes. Gagen did not work on April 19, 2004 (Monday). The remainder of the week, under Demian's approval, he worked from home. On April 22, 2004, Gagen provided a doctor's note at CNA's request. The note stated that Gagen should not be at work until April 27, 2004, but could work from home. Gagen worked from home until April 27, 2004, but he alleges that Demian called and harassed him during that time. Following his release from the hospital, Gagen's physician advised him to apply for FMLA. Gagen alleges that he requested the FMLA paperwork from Demian on several occasions. Demian stated that she would need to discuss the paperwork with Lisa Harrell ("Harrell"), a human resources employee. He was never given the FMLA paperwork.

CNA's FMLA policy states, "CNA may request employees on FMLA leave to submit health care certification stating that their serious health condition prevents them from performing essential functions of their job, or that the employee is needed to care for a family member with a serious health condition. If required, a doctor's note may suffice." The policy further provides that "FMLA provides up to 12 weeks of unpaid leave (which may be substituted with available Paid Time Off) in a rolling 12-month period." Full-time employees working part time or taking intermittent FMLA leave

"receive the prorated equivalent of the full-time salary for the time worked or the time commitment."

In April 2004, the same month Gagen was diagnosed with Type II Diabetes, RMIS member Anna Torres ("Torres") was diagnosed with a brain aneurysm. She worked from home for a few days and then was off on FMLA leave for about three months. She returned to work around July 5. Torres took another 5-6 weeks of FMLA leave in 2006. Torres was given the FMLA paperwork without requesting it.

### C. Reduction in Force

In July 2004, CNA had a reduction in force ("RIF"). Demian and Gicewicz were told that they had to eliminate one of the nine RMIS consultants in Gagen's unit. The CNA Human Resources Policy Manual in effect at the time of the RIF states, "For job eliminations, management with the assistance of Human Resources should conduct a skills assessment to determine the best employee to retain for the future organizational needs. Human Resources should independently prepare a diversity analysis." In order to identify who to let go in an RIF, CNA identifies skill sets and competencies that are needed for the position. The manager then rates each employee using a 1 to 5 scale. According to CNA, the review is based on overall competencies and skills, not whether an employee met specific objectives for one year. As a result, yearly performance evaluations are not used in RIF decisions because they rate employees based upon specific objectives established for that

particular year.  In a RIF, CNA looks at the overall skill set of the potentially affected employees.

In order to conduct the analysis for the RIF, Demian and Gicewicz conducted a skills analysis of each member in Gagen's unit using a template provided by Harrell.  Gagen alleges that Demian did not use the Human Resources Policy Manual to conduct the analysis but gathered data to complete an Excel spreadsheet "based on [her] experience with the individuals."  Gagen Ex. 4.  Demian and Harrell evaluated each member of the RMIS group based his or her performance in the following categories:  (1) Accountability and Follow-Through; (2) Results Focused; (3) Analyzes and Solves Problems; (4) Customer Focus; (5) Teamwork and Collaboration; and (6) Technical Expertise.

Demian performed a skills assessment based solely on her employees' 2004 performances.  She rated Gagen a "1," the lowest score, on Accountability and Follow Through, defined as taking responsibility for your actions.  She alleges that she assigned Gagen that score because he would not deal with problems or take responsibility for dealing with them.  Specifically, Gagen complained about behavior of his co-workers but did not address them directly.  Demian also gave Gagen a below average score in Teamwork and Collaboration because he was unable to work well with his teammates.  Demian alleges that she did not take into account Gagen's 2003 performance evaluation in her RIF review.

Demian and Gicewicz submitted their rankings and scores to Harrell. Harrell inserted weightings for each criteria and then tabulated the scores. According to her tabulations, Gagen was rated the lowest of the nine employees. At the time of Gagen's termination, he was 43 years old. The remaining RMIS Consultants were ages 48 (Elsbeth Ritz), 48 (Anna Torres), 45 (Robin Taylor), 42 (Gregg Rothermel), 41 (Karen Walton), 39 (Kathy Green), 38 (Jeffrey Blanchard), and 36 (David Newhouse).

In October 2004, CNA terminated four additional RMIS Consultants, Jeffrey Blanchard, David Newhouse, Gregg Rothermel, and Katy Green, for misconduct in backdating computer entries. CNA has not replaced any of the terminated employees. Of the remaining four RMIS consultants, three are older than Gagen and the fourth (Walton) is less than two years younger.

### D. Termination and Severance Package

On July 11, 2004, Gagen met with Demian and Harrell and was informed that he was being terminated effective September 11, 2004. Harrell presented him with a General Release and Settlement Agreement ("the Agreement") and met with him for around twenty minutes. The Agreement provided for a pre-tax payment of approximately $46,000.

The Agreement stated:

> if [Gagen] files any claims or suits in violation of this Agreement, this Agreement shall constitute a bar and complete defense to said claims or suits. Employee further

> understands and agrees that in the event any suit or claim is filed in violation of this Agreement, Employee shall be required to return the additional pay and benefits received under this Agreement and shall pay all costs and expenses of defense incurred by the Company, including but not limited to, reasonable attorney's fees, incurred by the Company in obtaining a dismissal thereof or otherwise in enforcing this Agreement.

Gagen Dep., Ex. 2.

Gagen alleges that Harrell told him that he had two weeks to sign the agreement, any refusal to do would result in loss of insurance coverage and the money would be sent via mail. The Agreement, however, provided that Gagen had 45 days to sign it.

After his termination, Gagen contacted CNA Senior Vice President of Employee Relations Robert Keith ("Keith") with questions about his termination, other job options, and severance and insurance continuation issues. Keith provided Gagen with the services of Mike Mulligan ("Mulligan"), an outplacement counselor to help him find new employment. Gagen claims that Keith induced him to sign the Agreement by telling him that signing it would not hurt him. Gagen also claims that he was distraught and unable to understand the Agreement. Gagen signed the Agreement on August 14, 2004. In accordance with the Agreement, he received a severance payment of $46,257.29, which was deposited into his bank account.

### E. Job Efforts

During July and August 2004, Gagen applied for positions through CNA's external website. Various CNA managers, including

Harrell and Keith encouraged Gagen to apply for other positions. His resume and applications were evaluated by a CNA recruiter, David Benton ("Benton"). On September 3, 2004, Benton sent Gagen an email stating, "I wanted to let you know that I received your resume from several people within CNA and also on our posting site. I have reviewed your background and as far as I can tell I do not have a current posting that fits well with your experience. I have forwarded your resume on to several of my managers to get their thoughts in case I have missed anything. I will let you know if anything comes of this and if we identify any positions that may be possibilities." Gagen Dep. Ex. 16. Gagen alleges that he applied for more than 40 positions within the CNA but received no interviews or job offers.

On October 20, 2004, Gagen signed a charge letter with the Equal Employment Opportunity Commission (the "EEOC") alleging that he was discriminated against by CNA based on his disability under the ADA, age discrimination and the FMLA.

## II. ANALYSIS

### A. Summary Judgment

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court

must view all the evidence and any reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000).

### B. Age Discrimination

The ADEA makes it unlawful for an employer to terminate an employee because of his age. 29 U.S.C. § 623(a). Because Gagen presents no direct evidence of discrimination, his ADEA (and ADA) claims proceed under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973); *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001). First, Gagen must make a *prima facie* case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was discharged; and (4)other, similarly situated employees who were not members of the protected class were treated more favorably. *Id.* If Gagen establishes a *prima facie* case, then CNA must produce a legitimate, non-discriminatory reason for his termination. *Id.* Then, in order for Gagen to prevail, he must rebut CNA's legitimate reason by presenting evidence that could enable the trier of fact to find that CNA's reason is merely a pretext for discrimination. *Id.*

For purposes of this motion, the CNA concedes that Gagen has established a *prima facie* case. CNA puts forth a legitimate, non discriminatory reason for terminating Gagen, namely he was terminated as a result of the RIF. He was selected for termination

through a skills assessment developed by Harrell and Demian. In selecting Gagen for termination, they reviewed all nine employees' current performance and competencies but did not consider their age. Damien ranked Gagen the lowest in several categories based on his behavior in 2004, specifically Accountability and Follow-Through and Teamwork and Collaboration. She then submitted the rankings to Harrell, who assigned weights to each competency and tabulated the scores.

In order to show pretext, Gagen must show that CNA's explanation is not honest. *See, Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)(even if the employer's reason for not selecting the plaintiff "were mistaken, ill considered or foolish," as long as the employer honestly believed those reasons, pretext has not been shown). Gagen argues that CNA predetermined that he would be fired based on his age and then cherry-picked data to ensure he would be ranked the lowest of the nine employees. He also asserts that they ignored 18 years of service and numerous positive evaluations. Instead, he asserts, Demian used subjective data to assess each employee's performance.

Gagen's arguments on the RIF process do not create a triable issue of fact on the issue of pretext. Although he points to his positive past reviews, Gagen does not offer any evidence that Demian or anyone at CNA intentionally discriminated against him based on his age. Demian and Harrell assessed each employee using

data independent of the person's age. In fact, CNA retained the two eldest employees in Gagen's group. Although Gagen had positive performance reviews and long-standing record, an employee's past performance is not indicative of present performance. *Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1115 (7th Cir. 1992). Additionally, the fact that subjective data was used does not establish pretext. *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1168 (7th Cir. 1998).

## C. Americans with Disabilities Act

The Americans with Disabilities Act (the "ADA") proscribes discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, . . . and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). In order to establish a *prima facie* case of discrimination, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation; and (3) he has suffered from an adverse employment decision because of his disability. *Dvorak v. Mostardi Platt Associates, Inc.*, 289 F.3d 479,483 (7th Cir. 2002). For the purpose of this motion, CNA concedes that Gagen is qualified to perform the essential functions of the job and moves for summary judgment on the first and third elements only.

### *1. Disability under the ADA*

Gagen can prove that he is disabled under the ADA in one of three ways: (1) he has a physical or mental impairment that substantially limits one or more major life activities; (2) he has a record of such impairment; or (3) he is regarded as having such an impairment. 42 U.S.C. § 12102(2); *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 193 (2002). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(I). A person is substantially limited if, compared to the average person in the general population, he cannot perform or is limited in the manner in or extent to which he can perform one of the recognized activities. 29 C.F.R. § 1630.2(j)(ii); *Dvorak*, 289 F.3d at 484.

CNA contends that Gagen is not disabled within the meaning of the ADA because his impairments do not substantially limit a major life activity. It asserts that Gagen is not severely restricted with regard to eating because his restrictions are predominantly intended for weight control. *Scheerer v. Potter*, 443 F.3d 916 (7th Cir. 2006). Gagen is able to control his diabetes with medication and diet and goes weeks without any diabetes-related problems. CNA further claims Gagen has no record of being disabled and has not submitted any evidence that he was regarded by CNA as disabled.

To survive summary judgment, Gagen must provide specific facts establishing that there is a genuine issue of material fact as to whether he is substantially limited in a major life activity, conclusory allegations will not do. *Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006). Diabetic status, *per se*, does not establish a disability under the ADA. *Id.* Instead, the court looks to the specific impairments suffered by the individual to determine whether he meets the high threshold of establishing a genuine issue of material fact as to substantial limitation. *Id.,* citing *Lawson v. CSX Transp., Inc.,* 245 F.3d 916 (7th Cir. 2001).

Gagen fails to establish any specific fact that he suffered from a substantial limitation in a major life activity. He states that CNA knew Gagen was diagnosed with Type II Diabetes and his physician stated that his condition was not under control. He admits, however, that he returned to work following his hospitalization and continued to perform his job duties. He controlled his diabetes through diet and oral medication and was not affected in caring for himself, eating, hearing, sleeping, or working. *See, E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 801 (7th Cir. 2005). Gagen fails to establish that his diabetes severely restricted any life activities. Accordingly, summary judgment is granted with respect to Gagen's ADA claim.

### D. The FMLA

The FMLA provides eligible employees the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition. 29 U.S.C. § 2612(a)(1). After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of the employment that existed prior to the exercise of the leave. 29 U.S.C. § 2614(a). To insure the availability of these guarantees, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided." § 2615(a)(1). The FMLA further provides that nothing in it shall be construed to entitle a restored employee to any position that the employee would not have been entitled had the employee not taken the leave. 29 U.S.C. § 2614(a).

Gagen alleges that CNA interfered with his FMLA rights by failing to provide him with documentation in order to request FMLA leave. He requested the form from Demian in an effort to become eligible for time off on an intermittent basis. Instead of providing Gagen the forms, Demian requested that Gagen provide a doctor's note regarding his condition. Gagen claims that had he been allowed to apply for FMLA, he would have been a protected employee and would not have been selected for termination.

Under CNA's FMLA leave policy, Gagen was not required to fill out forms in order to be granted FMLA leave. Instead, the policy explicitly states, "a doctor's note may suffice." Demian requested that Gagen submit a doctor's note in accordance with CNA's policy. Once he submitted the doctor's note, Gagen admits that he was granted the leave he requested, he was permitted to work from home, and attend doctors' appointments whenever necessary. Thus, Gagen does not allege that he was deprived of an entitlement under the FLMA. Although Gagen alleges that had he filled out FMLA paperwork he would have had some sort of protected status, his allegation lacks support. An employee with FMLA status is not entitled to any "right, benefit, or position" that he was not entitled to before taking FMLA leave. 29 U.S.C. § 2614(a)(3); *see, also, Rice v. Sunrise Express, Inc.*, 209 F.3d 1008 (7th Cir. 2000). Summary judgment is granted on Gagen's FMLA claim.

### E. Counterclaim

CNA also moves for summary judgment on its counterclaim for the return of the $46,257.00 severance payment that Gagen received. The Agreement states: "[e]mployee further understands and agrees that in the event any suit or claim is filed in violation of this Agreement, Employee shall be required to return the additional pay and benefits received under this Agreement. . . ." By signing the Agreement, Gagen agreed that if he sued CNA on the released claims, he would be required to return the additional pay that he received.

Gagen argues that he relied on the advice of CNA counsel in signing the Agreement and he was under duress when he signed it.

Gagen's claim that he signed the Agreement under duress does not excuse him for having to pay back the severance payment. CNA is not arguing that the Agreement should be a bar to Gagen's suit. *See, Bormann v. AT&T Communications, Inc.*, 875 F.2d 399 (2d Cir. 1989). Rather, CNA contends that by filing this suit, Gagen has effectively rescinded the Agreement and, as such, must return the consideration he received in return for signing it. As the Seventh Circuit stated in *Fleming v. U.S. Postal Service AMF O'Hare,* 27 F.3d 259, 262 (7th Cir. 1994), if "A" sells a car to "B" for $5,000 and then sues to rescind the sale and recover the car on the ground that "B" induced the sale at that price by some fraud, "A" must tender the $5,000 to "B." The idea of rescission is to put the parties back where they were before the contract; to undo the contract. *Id.* (citation omitted). It is the same with a release, which is just another contract. *Id.*

Gagen received the severance payment in exchange for relinquishing his legal claims for his termination. Gagen decided to assert his legal claims, thus, he has to return the payment. *Wright v. Heritage Environmental Services*, No. 99 C 7579, 2000 WL 1474410 (N.D. Ill. Oct. 4, 2000)(holding that an employee cannot rescind a contract without returning to the other party any

consideration received under it.). Thus, summary judgment is granted on CNA's counterclaim.

### III. CONCLUSION

For the reasons stated herein, Defendant's Motions for Summary Judgment are **GRANTED**.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated:    January 3, 2007